PRESTON *v.* MACCRONE & CO.

1. FRAUD—CONSPIRACY—SALES—PROOF—SUFFICIENCY.
   In a suit by the buyer of certain corporate stock to have the sale set aside on the ground of fraudulent conspiracy between the brokerage firm making the sale and another firm from which the stock was secured, evidence of a conversation between plaintiff, who already owned some of the stock, and certain members of the latter firm, a few days before the sale, in which they said, among other things, that they were sure that the price of said stock would materially advance within a week, and which plaintiff testified he regarded as "joshing" and characterized by too much enthusiasm, *held*, insufficient to sustain plaintiff's claim that defendants were engaged in "booming" the price of said stock.

2. SAME—TELEGRAM—EVIDENCE—ADMISSIBILITY.
   A telegram to plaintiff from a brokerage firm in another city requesting a ten-day option on all of plaintiff's said stock

at $30 ·a share, which influenced him in his decision to purchase defendants' stock at $28, which plaintiff claimed was part of the scheme to defraud him, *held*, inadmissible in the absence of evidence in any way connecting defendants with the sending of the same.

3. SAME—EVIDENCE—SUFFICIENCY.

Evidence *held*, insufficient to sustain plaintiff's claim that defendants were engaged in "booming" said stock.

4. BROKERS—DUTY TO ACT IN GOOD FAITH—FAILURE TO DISCLOSE—FRAUD.

It is the duty of a broker in carrying out a commission for a client to act in good faith and with integrity, and not to conceal from plaintiff material facts within its knowledge respecting the transaction.

5. FRAUD—EVIDENCE—SUFFICIENCY—BURDEN OF PROOF.

Plaintiff's claim of fraud on the part of defendant brokerage company, *held*, not sustained by the burden of proof.

6. SAME—BROKERS—EVIDENCE—SUFFICIENCY.

Evidence *held*, insufficient to establish plaintiff's claim that it was understood between himself and defendant broker's agent that to fill plaintiff's order the broker was confined to the purchase of the stock of a certain individual.

7. SAME—BROKERS—BREACH OF DUTY—FAILURE TO DISCLOSE.

In the absence of an agreement between the purchaser and the broker that the latter was to be confined to the purchase of the stock of a certain individual, it would not be a breach of the broker's duty to fail to disclose to the purchaser the name of the person from whom the stock was purchased.

8. SAME—SALES—RESCISSION.

Plaintiff's refusal to receive said stock, and his indorsement of same in defendant broker's office, *held*, not to amount to a rescission of the agreement of purchase so as to relieve plaintiff of liability for the purchase price, but was done to save unnecessary inconvenience of the broker and impairment of its capital.

9. SAME—EQUITY—RELIEF—PROOF.

While upon the record in this case plaintiff is not entitled to relief against defendant broker, who is given a decree under its cross-bill, said decree is without prejudice to

such further proceedings by plaintiff against the remaining defendants, or any of them, as may be advised; they not having been sworn or any explanation of their part in the transaction having been given.

Appeal from Ionia; Davis (Frank D. M.), J. Submitted April 22, 1920. (Docket No. 38.) Decided December 21, 1920.

Bill by Thad B. Preston against MacCrone & Company and A. W. Wallace, Wesley J. Peoples and Lawrence P. Leonard, copartners as A. W. Wallace & Company, to set aside an alleged fraudulent sale of corporate stock, and to enjoin an action at law. Defendant MacCrone & Company filed a cross-bill asking affirmative relief. From a decree for plaintiff, defendants appeal. Reversed, bill dismissed, and decree entered for defendant MacCrone & Company.

*Hawley & Eldred,* for plaintiff.

*Jewell & Smith* (*Cummins & Nichols,* of counsel), for defendant MacCrone & Company.

*Guy A. Miller,* for defendant A. W. Wallace & Company.

CLARK, J. Plaintiff, a banker and manufacturer of considerable experience in stock transactions, a resident of the city of Ionia, on November 12, 1918, and for several months prior thereto, owned about 4,000 shares of the capital stock of the Michigan Copper & Brass Company, a Michigan corporation, having its principal office in Detroit. The capital stock was divided into 100,000 shares of the par value of $10 each. The stock was not listed at any stock exchange. The defendant MacCrone & Company, a corporation, and the defendants Alfred W. Wallace, Wesley J. Peoples, and Lawrence P. Leonard, trading as A. W. Wal-

lace & Company, were stock and investment brokers, having offices in Detroit.   On the date aforesaid Mac-Crone & Company owned over 3,000 shares of said stock, and A. W. Wallace & Company were also own-ers of certain of the shares, the number of which is disputed but claimed by plaintiff, and, we think, ad-mitted by the answer of defendants A. W. Wallace & Company, to be at least 1,000 shares.

On said date plaintiff directed defendant MacCrone & Company, through its agent W. D. Munro, to pur-chase for him 1,000 shares of said stock at $28 per share, to which was to be added a commission of ⅛, making the cost to plaintiff $28⅛ per share.   The purchase was made and reported to plaintiff who on November 18, 1918, forwarded to MacCrone & Com-pany his personal check for $28,125 in payment of the stock and commission.   On the following day plain-tiff wired MacCrone & Company not to have the cer-tificates changed or the stock transferred until he ar-rived in Detroit, which he did on November 20, 1918. The stock had already been transferred by the Union Trust Company, the transfer agent, and certificates had been issued in plaintiff's name.   Plaintiff refused to accept the certificates and stopped payment on his check.   He indorsed the certificates at the office of MacCrone & Company.   Later being requested by at-torneys for MacCrone & Company to accept the certi-ficates and to pay for the stock, and being told that if he did not comply suit would be commenced against him, and having notice that MacCrone & Company in-tended to sell the stock and hold him for any deficiency, plaintiff caused his bill of complaint to be filed, seeking decree that the alleged sale of the stock was fraudulent and void and had been brought about by the fraudu-lent conspiracy and combination of the defendants, that the check by plaintiff had been obtained by fraud and false pretenses, and that it be surrendered and can-

celed, and that defendant MacCrone & Company. be restrained from commencing suit against plaintiff for the purchase price of the stock and from selling and disposing of the said stock.

Defendant MacCrone & Company answered and by cross-bill asked that plaintiff be decreed to owe and to pay to it the amount due on the purchase price of the stock. The other defendants answered. A temporary restraining order was made agreeable to the prayer of the bill of complaint, but defendant Mac-Crone & Company was permitted to sell and dispose of said stock which sale "shall in no wise affect the claim of the plaintiff to the relief prayed for in his bill of complaint, nor affect the claim of MacCrone & Company to hold plaintiff liable for any loss that may result on such sale." A sale of the stock under this order resulted in a loss of $8,964.50. After hearing decree was entered granting to plaintiff the relief prayed in his bill. The defendants have appealed. Plaintiff contends that on the hearing it was established:

"(1) A conspiracy existed between MacCrone & Company and Wallace & Company for the purpose of selling and unloading one thousand shares of this stock upon the plaintiff at and for the price of $28 per share.

"(2) That MacCrone & Company, through their duly authorized officer and agent, O. C. Timewell, consented to a cancellation of the check in question, and also took and received in their own name for their own use and benefit an assignment and transfer of the certificates of stock in question in this case, and thereby discharged the plaintiff from any further liability of said check, thereby recognizing the unfair method by which the sale of said stock to said plaintiff had been consummated and the voidable nature of said sale and of said check; and that the threats of said MacCrone & Company thereafter to institute proceedings at law to enforce the payment of said check, operated as a fraud upon the rights of said plaintiff.

"(3) That outside of any conspiracy MacCrone & Company was guilty of fraud upon the plaintiff in the transaction in question, entitling and authorizing the plaintiff to refuse to honor the check in question and authorizing and requiring this court to vacate and set aside the sale of said stock and to cancel the said check."

1. Conspiracy. In this regard the first element of plaintiff's claim is that for some time prior to November 12, 1918, Wallace & Company had been engaged in "booming" the said stock in causing by the use of "artificial means and instrumentalities," the said stock to have a seeming value in excess of its actual value. To support this part of his claim plaintiff related a conversation with defendants Peoples and Wallace, with whom he was acquainted, at the Hotel Statler in Detroit about November 6, 1918:

"He asked me if I had seen what Michigan Copper & Brass was doing. I said no. He said that he had bought a little a couple of weeks before at 20½ and that now it was 22, 23, or 24. I told him that was fine. He said he was sure that within a week it would be 28. I told him that he always was enthusiastic. He said there was a deal on in which Mr. Durant of the General Motors was talking of buying stock and also E. C. Converse of New York and that he could sell his stock for 30, but would not sell it for less than 35. We talked about 15 minutes and that was the substance of the conversation. He said that he had just seen Mr. Durant at the D. A. C., but not to talk to."

And of this conversation plaintiff also said "we were joshing one another about Michigan Copper & Brass." By this conversation, standing alone, plaintiff's claim respecting the "booming" of prices could not be sustained. Plaintiff himself regarded it as mere "joshing" and as characterized by too much enthusiasm.

Plaintiff also testified that on November 8, 1918, he received the following telegram:

"New York, 4:43 p. m., Nov. 8, 1918.
"T. B. PRESTON,
    "Sorosis Garment Company,
        "Ionia, Michigan.
"May we have ten-day option on your Michigan Copper & Brass at 30; state number of shares.
                    "CHANDLER BROS. & COMPANY."

This telegram was received in evidence upon the statement of counsel for plaintiff:

"Part of the history of the case, if we do not connect it we do not ask anything for it."

The record fails to show that defendants, or any of them, caused or contributed in causing the telegram to be sent, or that they, or any of them, had any knowledge of it in advance of its being received by plaintiff. But plaintiff seems to have been influenced by it. He refused the option at $30 per share, and the following day by telephone informed defendants Wallace & Company of the telegram and of his refusal to give the option. It may be, for all the record shows, that some of defendants' later enthusiasm as to the stock was due to this telegram and plaintiff's statement regarding it. Plaintiff owned more of this stock than any of the defendants.

We think the record shows that on November 11, 1918, there was a sale of 100 shares of this stock at $28 per share, and also a sale of 100 shares at $29.50 per share; that when the armistice was signed there was activity in stock markets; that "war" stocks, so-called, went down and that "peace" stocks, so-called, went up, and that Michigan Copper & Brass was a "peace" stock. Considering all of the evidence we think that plaintiff's claim as to "booming" this stock is not sustained by the record.

The plaintiff claims that the consummation of this alleged conspiracy was his giving on November 12, 1918, an order to purchase 1,000 shares of said stock

at $28 per share, which was brought about and in-
duced by the concurring fraud of both of these broker-
age concerns. On that day plaintiff's order to pur-
chase the stock was given by telephone to W. D.
Munro, salesman of defendant MacCrone & Company,
who executed the order by purchase of 1,000 shares of
the stock from defendants Wallace & Company.
Plaintiff claims that it was represented by Munro
that the stock to be purchased belonged to one Weil,
a business man of Detroit; that he was buying the
stock not for investment but for immediate sale, and
he seems to have regarded Wallace & Company as
"insiders" as to this stock, and says that had he known
they were selling the stock he would not have pur-
chased for the purpose stated or for any purpose, and
further asserts that he was misled and deceived in this
regard by Munro, and that Munro, as salesman for
MacCrone & Company, failed to exercise toward plain-
tiff good faith, which it was the duty of the broker to
do, but on the contrary concealed and misrepresented
the identity of the owner of the stock in furtherance
of the conspiracy to "unload" upon plaintiff 1,000
shares of the stock owned by Wallace & Company.

Of the telephonic conversation with Munro plaintiff
testified:

"He asked me what was doing out there in Michigan
Copper. I said 'nothing.' He said, 'there seems to be
some little excitement about it.' I told him that I had
a telegram from Chandler Bros., asking for an option
on my holdings. I either told him what the telegram
was or read it to him; I think I just merely told him.

"Q. So you informed him of the same telegram?

"A. Yes, sir. He said, 'You know that party I was
talking with you about.' I said, 'No, who do you
mean?' He said, 'Weil has 1,000 shares of stock that
he wants to sell, but he does not want to throw it on
the market because it will break the price; the price
is now about 29 or 29½. I have got a party who will
use 500 shares, do you want the other 500?' I said

that I did not want any unless I could use it with some one else, and if I could, I could probably handle 1,000 shares just as well as 500. He said, 'I can get it for you at 28½.' I told him that I would see if I could but that he could see if he could get it for 28 and call me back in an hour, and in that time I would tell him whether I could handle it or not. He asked me if the price of 28 would be subject to a commission, and I said 'Yes, ⅛.' "

Munro, called by plaintiff for cross-examination, testified:

"*Q.* Now on the 12th of November, 1918, you called up Preston?

"*A.* Yes, sir. I wanted to get his order for some stock. I expected his order would consummate in a sale, providing I was able to get the stock at the agreed price.

"*Q.* At that time you say in your affidavit and admitted in the answer that you did mention Weil's name?

"*A.* I did. I mentioned it to Preston.

"*Q.* What did you mention Weil's name to Preston for?

"*A.* Mr. Preston requested to know whose stock I expected to get.

"*Q.* What did you tell him?

"*A.* I told him I would endeavor to get Mr. Weil's.

"*Q.* Why did you mention Weil's name?

"*A.* Preston and I had talked over Weil as being one of the largest stockholders on many occasions previous to November 12th.

"*Q.* Did you mention Wallace's name to him?

"*A.* I didn't.

"*Q.* Why not?

"*A.* I didn't have any reason to.

"*Q.* You did mention Weil's name?

"*A.* No, Preston made the remark he wanted to know whose stock I expected to get and used those words, 'That Jew.' I said, may be possible to get Weil's stock.

"*Q.* And the reason you mentioned Weil's name was because he happened to do that, was it?

"*A.* I had endeavored to get Mr. Weil the day be-

fore and had been informed by a party in our office that Mr. Weil would dispose of his stock at a higher figure.

"Q. Was informed by who?

"A. By a member of our office, MacCrone & Company office.

"Q. You didn't get any such information from Weil?

"A. I had known from Weil six weeks previous he wanted to dispose of his stock on the first market rise.

"Q. Did you have any object or purpose in mentioning Weil's name to Preston?

"A. Except he wanted to know if it was 'that Jew' stock I had in mind. I replied yes, I was endeavoring to get Weil's stock.

"Q. Had it occurred to you that maybe it was Weil's stock that Preston had wanted?

"A. No, sir, never. We talked Michigan Copper & Brass stock.

"Q. Did it not appear to you if he got any stock perhaps it might be Weil's stock was the one he wanted?

"A. That impression was not given. It was not mentioned that it must be Weil's stock, and it did not occur to me that perhaps he did not want to purchase anybody else's stock.

"Q. You didn't know what reason he had for mentioning Weil's name?

"A. No, sir; he just having had a previous conversation along that line.

"Q. That was all that occurred to you about it?

"A. Yes, sir.

"Q. Did you ask him if he was particular about the purchase of Weil's stock?

"A. No, sir.

"Q. Why didn't you?

"A. I didn't see there was any necessity for it.

"Q. Why didn't you say to Preston, do you want me to purchase Weil's and not purchase anybody else's?

"A. I never had that request made to me in my life in my experience in the broker's business to purchase any particular man's stock.

"Q. Did it occur to you that possibly Preston might want to purchase this stock, if he purchased at all, for the purpose of making a quick sale?

"*A.* No, sir; that didn't occur to me.

"*Q.* Did he say that was what he wanted?

"*A.* No, sir, didn't mention that to me.

"*Q.* Do you know what it was he asked for an hour's time to find out?

"*A.* No, sir, I don't; I don't know why it was he made that request. He didn't tell me why it was he made that request; he didn't make any explanation why he wanted that length of time and I didn't ask any explanation of it."

Following the talk with Munro plaintiff talked with Wallace & Company, of which plaintiff said:

"I called up Wallace & Company after Munro talked with me the first time and I got A. W. Wallace himself. I said to Mr. Wallace, 'I have just been called up by a house in Detroit'—I won't say that I told him who it was—and that they had 1,000 shares of Michigan Copper & Brass that could be bought I thought at 28 and asked him whether he had any place to use it. He said, 'Sure I got a customer that can use it.' I asked him what he could get for it and he said, 'I can get 29½ anyway and I think I can get you 30.' I asked him if he was sure that he could handle it and he said, 'Sure, it sold for 29½ yesterday or the day before; market very active.' I told him that I did not want this unless he could handle it. I would not take it. He said, 'Go on and get it.' He said, 'All right, I will call you right up if I do get it.' I told them to see if they could buy it for 28 and if they can get it for that, I will call you right back. I said, 'All right, that is fine.'"

Within the time Munro called plaintiff and said, as plaintiff claims:

"'I have seen that party and have got the stock at 28'—I won't say he said he had seen the party or whether he said he talked with him, or had reached him. It was a very short conversation. I don't recollect that anything further was said. In none of these talks was the names of A. W. Wallace & Company mentioned or the names of anyone else except Weil."

And Munro testified:

"I confirmed to him for purchase of 1,000 shares of Michigan Copper & Brass Company for him for 28 plus ⅛ commission, called him up by telephone and told him that.

"*Q.* Did you tell him who it was you bought the stock of?

"*A.* No, sir.

"*Q.* Didn't you tell him you bought the stock of that party?     *     *     *

"*A.* No, sir. I told Preston I had secured 1,000 shares of Michigan Copper & Brass for him at his bid, which was 28 plus ⅛ commission.

"*Q.* Did you tell him it wasn't the Weil stock you had bought?

"*A.* No further mention was made of whose stock it was; it wasn't asked as to whose stock it was."

After this talk with Munro plaintiff talked with defendant Wallace and told him of his purchase of the stock. Wallace told him he would see the customer who was to handle it and call plaintiff immediately. Later that day Wallace wired plaintiff: "My client on copper expects definite information tomorrow— will advise you immediately." Not hearing from Wallace plaintiff saw him two or three days later and was told that the prospective customer had reached no decision. A customer was not found. About November 15th or 16th plaintiff was advised that the stock was worth about $26 per share, and, as we have seen, sent his check to MacCrone & Company on November 18th. Plaintiff said that on November 19th, while visiting with a broker at Grand Rapids, he became suspicious and that it came to him like a flash that he had been "double-crossed" by the defendants. After requesting by wire that the stock should not be transferred to him he came to the office of MacCrone & Company and asked to be informed from whom the certificates for 1,000 shares had been purchased and was told by employees at the office that,

212—Mich.—9.

owing to a custom of brokers not to divulge names of persons for whom, or to whom, stock sales were made, the information would not be given. Plaintiff learned from the transfer agent that the stock had been purchased by MacCrone & Company from Wallace & Company, and then, as we have said, stopped payment on his check.

While we recognize that it was the duty of MacCrone & Company, in carrying out the commission as plaintiff's broker, to act in good faith and with integrity and not to conceal from plaintiff material facts within its knowledge respecting the transaction, and, having considered the able briefs of counsel and cases cited respecting fraud, conspiracy, manner and method and character of proof, we think that as to the claim of fraud on the part of MacCrone & Company the plaintiff has not sustained the burden of proof. It is significant that MacCrone & Company, said to have entered into a conspiracy to defraud plaintiff, a customer, in "unloading" upon him 1,000 shares of the stock owned by Wallace & Company, was itself the owner of over 3,000 shares of stock. Plaintiff did not tell Munro that he intended to sell the stock to Wallace & Company, nor is it to be inferred upon this record that Munro, or MacCrone & Company, before purchase and transfer of the stock, had knowledge of such intention. While between plaintiff and Munro there was conversation as to the Weil stock, plaintiff's statements that the stock to be purchased was to be the Weil stock and that the purchase of Weil stock was reported to him are denied by Munro. That plaintiff told Munro that he was buying for immediate sale is also denied.

By a careful reading of this record we think it is not established that it was understood and agreed by and between plaintiff and Munro, acting for MacCrone & Company, that to fill plaintiff's order Munro

was confined to the purchase of the Weil stock. The conversation as to this stock related to the possibility of purchase of the number of the shares at the price named. And unless plaintiff's claim in this respect shall be taken as established by the proofs it would not in this case be a breach of the duty of MacCrone & Company, his broker, to fail to disclose to plaintiff the name of the person from whom the stock had been purchased. See 1 Dos Passos on Stock Brokers and Stock Exchanges (2d Ed.), p. 223; *Peckham* v. *Ketchum,* 5 Bosw. (N. Y.) 506.

At the very hour that defendant Wallace was advising plaintiff to buy the stock at 28 and assuring him that defendants Wallace & Company would act as his brokers for immediate sale, a "quick turnover," of the stock, that he should buy that they might sell for him, and that they believed they had a customer who would take the stock at 30, Wallace & Company were selling 1,000 shares of their own stock at 28. And they were selling these 1,000 shares to a broker, MacCrone & Company, knowing that at the very time plaintiff, being advised by them, was buying 1,000 shares.

Plaintiff testified:

"My complaint against Wallace & Company is that they made me believe that they had a customer for the stock and crookedly and dishonestly through misrepresentation they went and unloaded that stock on me through Munro.

"*Q.* They led you to believe they had a customer for it?

"*A.* Yes, sir; they led me to believe they had a customer for it and they could handle it at thirty dollars a share; then they went and sold it to me at 28 through Munro."

Defendants comprising the firm of A. W. Wallace & Company were not sworn. We have in the record no explanation for their part of the transaction.

2. *Rescission.* Plaintiff contends that when at the office of MacCrone & Company on November 20, 1918, he indorsed the stock certificates which had been issued in his name and for which MacCrone & Company had paid $28,000, a full rescission of the agreement was accomplished. Regardless of the question of whether or not the employees of MacCrone & Company with whom plaintiff talked had authority to rescind, we do not agree with plaintiff's contention. That was not the mind and understanding of the parties. Rescission then meant to MacCrone & Company a loss of at least $2,125. The indorsement of the certificates was, we think, to save unnecessary inconvenience of the broker and impairment of its capital, and was not intended to be conclusive of the question of plaintiff's liability.

3. It follows that plaintiff is not entitled to relief against MacCrone & Company. Nor upon this record can he be afforded relief against the other defendants.

The decree of the trial court is reversed. Decree will be entered here dismissing the bill of complaint and providing for the surrender and cancellation of plaintiff's check and for recovery by defendant MacCrone & Company against the plaintiff of the sum of $8,964.50 and interest. The decree will be without prejudice to such further proceedings by plaintiff against remaining defendants, or any of them, as may be advised. Defendants will recover costs of both courts.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, STONE, BIRD, and SHARPE, JJ., concurred.